UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,          :
                                   :
          -v-                      :
                                   :
LUIS FERNANDO MORA PESTANA,        :
     a/k/a "Silver,"               :
JULIO ENRIQUE LEMOS-MORENO,        :
     a/k/a "Andres,"               :
     a/k/a "Nader,"                :
CARLITOS LNU,                      :
ALEXIS LNU,                        :
     a/k/a "Alexi"                 :
FNU LNU                            :
     a/k/a "El Indio,"             :
ROQUE OROBIO LOBON                 :
     a/k/a "Roque Orobio Tobon,"   :
     a/k/a "Mello,"                :
     a/k/a "Tachuela,"             :
EDILBERTO BERRIO ORTIZ,            :
     a/k/a "El Gavilian,"          :
ALEJANRDO PALACIOS RENGIFO,        :
     a/k/a "El Gato,"              :
     a/k/a "Yimi," and             :
ANDERSON CHAMAPURO DOGIRAMA,       :
     a/k/a "El Tigre,"             :
     a/k/a "El Dairon,"            :
                                   :
          Defendants.              :
                                   :
------------------------------------x



S6 09 Cr. 109 (JSR)

MEMORANDUM

JED S. RAKOFF, U.S.D.J.

On May 12, 2009, the Government filed a Sixth Superseding Indictment ("Indictment") against defendants Edilberto Berrio Ortiz (a/k/a "El Gavilan"), Alejandro Palacios Rengifo (a/k/a "El Gato" or "Yimi"), Anderson Chamapuro Dogirama (a/k/a "El Tigre" or "El Dairon"), and six alleged co-conspirators.  The Indictment charged the defendants with conspiring to take hostages in violation of 18 U.S.C. § 1203 (Count One) and taking hostages in violation of 18 U.S.C. § 1203 and 2 (Count Two).  Indict. ¶¶ 1-4.

Both Counts of the Indictment arise from the April 4, 2008
kidnapping of Cecilio Padron (the "Victim"), an American citizen
living in Panama, by the 57th Front of the Fuerzas Aramadas
Revolucionarias de Colombia (the "FARC").  The Indictment alleges
that Ortiz, Renfigo, and Dogirama participated in the kidnapping
by guarding the Victim from April 6, 2008 to February 10, 2009, a
period of over ten months.  See Indict. ¶ 3(f).

In March 2011, all three defendants filed motions seeking to
raise at trial the affirmative defense of duress.  All three
defendants filed various affirmations, declarations, and reports
in support of their respective motions.  Following full briefing
and oral argument, the Court concluded that an evidentiary
hearing was necessary to determine whether the defendants could
present sufficient evidence to enable the defense to be raised at
trial.  See United States v. Paul, 110 F.3d 869, 871 (2d Cir.
1997) ("[I]t is appropriate for a court to hold a pretrial
evidentiary hearing to determine whether a defense fails as a
matter of law.  If, after the hearing, the court finds that the
defendant's evidence is insufficient as a matter of law to
establish the defense, the court is under no duty to give the
requested jury charge or to allow the defendant to present the
evidence to the jury.") (internal citations omitted).  During the
three-day evidentiary hearing, which commenced on May 9, 2011,

2

all three defendants took the stand to testify.  Additionally, expert witnesses were called to testify by two defendants.[1]  On May 23, 2011, after careful consideration, the Court issued a "bottom-line" Order denying the motions.  This Memorandum explains the reasons for the Court's decision.

Fundamentally, the defendants mistake a mitigating factor that should be raised at sentencing for an affirmative defense to substantive criminal liability. As the Supreme Court has explained, "[c]riminal liability is normally based upon the concurrence of two factors, 'an evil-meaning mind [and] an evil-doing hand. . . .'"  United States v. Bailey, 444 U.S. 394 (1980) (quoting Morissette v. United States, 342 U.S. 246, 251 (1952). Or, to use the familiar formulation of Blackstone, there must be both *mens rea*, a guilty mind, and *actus reus*, a guilty act.  But even when these basic conditions are satisfied, however, there are narrow circumstances in which criminal liability may be excused.

Duress is such a defense.  "The rationale of the defense is not that the defendant, faced with the unnerving threat of harm

---

[1] Dogirama called Dr. Neil Blumberg, a forensic psychiatrist. Rengifo called Dr. Katherine Porterfield, a clinical psychologist, and Dr. Marc Chernick, a professor at Georgetown University who has written extensively on the FARC.  Ortiz's proposed expert, Dr. Jose M. Arcaya, a psychologist, was unavailable to testify during the hearing, but Ortiz proffered Dr. Arcaya's expert report.

unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question.  Nor is it that the defendant has not engaged in a voluntary act.  Rather it is that, even though he has done the act the crime requires and has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is excused" because it is coerced.  Dixon v. United States, 548 U.S. 1, 7 n.5 (2006) (internal quotation marks and citations omitted).  Accord, United States v. Bailey, 444 U.S. 394, 402 (1980).  The defense of duress, however, must be narrowly construed, since "any rule less stringent than this would open the door to all sorts of fraud."  The Diana, 74 U.S. (7 Wall.) 354, 360-61, 19 L. Ed. 165 (1868).  Accordingly, the case law makes clear that the defense of duress is viable "only . . . if there is a real emergency leaving no time to pursue any legal alternative."   United States v. Posada-Rios, 158 F.3d 832, 874 (5th Cir. 1998).

Coercion that does not rise to this high level of legal duress may nevertheless be relevant, but only as to sentencing, rather than guilt or innocence.  Thus, it is important to note "[o]ne who commits a crime while subject to coercion, but whose situation does not come under the rules which permit him to be excused . . . may nevertheless properly urge that his punishment,

4

within the permissible limits of punishment for the crime in question, should be lower than it would have been if he had not been coerced." Wayen R. LaFave, Criminal Law § 9.7(d) (4th ed. 2003). In other words, even when the strict letter of the law does not permit a defendant's crime to be excused as a result of duress, the Court may properly consider evidence of coercion as a mitigating factor in determining the defendant's sentence.

So far as liability is concerned, however, "[d]uress is a legal excuse for criminal conduct [only] if, at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the unlawful activity." United States v. Paul, 110 F.3d 869, 871 (2d Cir. 1997) (internal quotation marks and citations omitted). Three discrete elements must be met to establish coercion or duress: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity." United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005). A defendant is entitled to submit the defense to the jury only if he can make "a prima facie

showing as to each of the elements." <u>United States v. Villegas</u>, 899 F.2d 1324, 1343 (2d Cir. 1990). By contrast, where the evidence to be presented would be insufficient as a matter of law, "no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter." <u>Id.</u>

During the evidentiary hearing, each of the defendants proffered several hours' worth of testimony, which the Court construes in the light most favorable to the defendants for the purposes of these motions.[2] According to their testimony, all three defendants were raised in conditions of dire poverty and forcibly abducted into the FARC as child soldiers: Ortiz was recruited at age 11, Rengifo was recruited at age 13, and Dogirama was recruited at age 12. <u>See</u> 05/09/11 Transcript ("Tr.") at 19, 98, and 221. Defendants were told that they were required to obey orders, and that failure to comply would result either in harsh punishment or execution.[3] Rengifo testified that

---

[2] <u>See</u> <u>United States v. Villegas</u>, 899 F.2d 1324, 1343 (2d Cir. 1990) ("On the basis of this proffer, the court again denied Berrio permission to present his duress defense. It concluded that, even viewing the evidence in the light most favorable to Berrio, his duress defense would be insufficient as a matter of law . . . . ").

[3] <u>See, e.g.</u>, Testimony of Ortiz, Tr. 230-34 ("[T]he FARC are ruled by a document which is the FARC discipline code. . . . So

the penalty for failing to follow a so-called "special order" would be death.[4]  Similarly, the defendants testified that individuals who attempted to escape the FARC risked execution by the FARC, execution by the Colombian government, or death by starvation or disease in the jungle.[5]

---

in that code, in the document is a list of the crimes by a which a person could be killed.  So it is depending on the commander that you have at the time, whether you run the risk of getting killed or not. . . . [If the death penalty is not imposed, the individual is subject to d]rasitc sanctions, what they call. Your weapon is taken from you.  You are asked to work a lot, to carry the wood.  You carry the sand.  You build the trenches. . . . It is very difficult.  You have to cultivate or grow something in order to eat."); Testimony of Dogirama, Tr. 101 ("[W]e were told that we had to obey orders to the letter, in other words, if I were told something, I would have to obey, so much so that I would be told, for instance, to stay someplace and not move.  And if I did, then they would tell me I was disobeying."); Testimony of Rengifo, Tr. 27.

[4] See Testimony of Rengifo, Tr. 27 ("Well, they would tell me whoever did not follow orders would be punished, and whenever a special order was given, a person would get killed.").

[5] See, e.g., Testimony of Rengifo, Tr. 21 ("[T]hey said that if I tried to leave the FARC, they would kill me or they would kill my family."); Id. 24 ("[T]he FARC intimidates you.  They say that if you try to leave then [sic], then they kill you.  And if you weren't killed by them, then the government

would kill you or you would be placed in prison.  That's what they used to tell you."); Testimony of Dogirama, Tr. 102 ("Well, they say if you flee, you will be killed.  If you are caught by the police or the army, you will be killed.  And if you are caught by the police or the army, they are going to use you as a guide and then later you are going to be killed."); Testimony of Ortiz, Tr. 226.

7

To impose discipline on the recruits, FARC commanders would typically convene a "war council" to determine the accused's punishment;[6] if the sentence of death were imposed, the accused would be taken outside and killed by a firing squad.[7]  Defendants testified that they personally witnessed individuals either killed or sentenced to death for disobeying orders or for trying to escape.  For example, Dogirama testified that he saw a FARC commander kill a young woman for insubordination "right in front of us."  Tr. 106-07.  Ortiz testified that he witnessed people taken away to be killed "[a]t least 200 times."  Id. 230.[8] Rengifo testified that he saw two people sentenced to death for attempted escape, although he also observed one instance in which a very young recruit was pardoned after attempting to escape. Id. 24-25; 33; 41-43.

Defendants also testified, however, that they knew of many individuals who had successfully escaped the FARC.  In particular, Rengifo testified as follows:

---

[6] Ortiz testified that punishments are ostensibly determined by a "jury," but that the commander could override the jury's decision.  See Testimony of Ortiz, Tr. 235 ("Q: But if a commander wants somebody dead, the person is killed, right?  A: Like it or not, the person is going to die, whether the troop agrees or not.").

[7] See Testimony of Rengifo, Tr. 43.

[8] Ortiz also testified that one of his brothers was partially paralyzed after being shot while attempting to escape the FARC, and another brother was "made to disappear."  Tr. 220.

8

Q: Despite those instances, during your time in the FARC, your 11 years in the FARC, people successfully escaped from the FARC as well, correct?

A: Yes, sure.

Q: More people successfully escaped than were caught and killed, correct?

A: Yes, of course.

Q: Many more than were caught and killed?

A: Yes, of course, because we met up with them later in Medellin.

Q: You yourself have met your former relatives or former FARC members after you escaped from the FARC?

A: Sure, of course, because they are studying in a program run by the government.

. . .

THE COURT: [D]o I understand this correctly that during the years that you were in the FARC, there were many people who successfully escaped, to your knowledge?

A: Yes, of course.

THE COURT: So, what made you think that you could not successfully escape or did you think you could successfully escape?

A: Well, the things, you would have to plan things out before escaping.

THE COURT: You could have done that at any time during the 13 years you were with the FARC, yes?

A: Well, back then I really had not found a person that would help me to escape or flee from the guerillas.

THE COURT: Did all the people who you understood or observed
escaping from the FARC during the previous years act in
concert with other people or did some of them act alone?

A: Well, they would flee from another company, from another
company that belongs to the same front.

THE COURT: But did some of them flee by themselves without
assistance from anyone else?

A: Without having any help and with help.

THE COURT: Both ways?

A: Yes, of course.

Tr. 77-78.

Similarly, Dogirama testified that he saw many people flee
successfully while he was in the FARC. Id. 146. As for Ortiz,
he explained that he himself had previously escaped from the FARC
in 1997; he separated himself from the group during the confusion
of a battle and turned himself into Panamanian authorities. Id.
237, 265-66. Although the FARC picked him up again three days
later, he apparently suffered no adverse consequence for his
desertion. Id. 265-66.

On April 5, 2008, a FARC commander known as "Silver" ordered
Ortiz, Rengifo, Dogirama, and three other FARC guerrillas to
guard an American hostage named Cecilio Padron. See, e.g., Tr.
30; 112; 247.[9] It is undisputed that none of the defendants

---

[9] When the order was given on April 5, 2008, Ortiz was 24 years
old (born on May 8, 1984), Rengifo was about 23 years old (born
in 1985), and Dogirama was 18 years old (born in January 1990).
See Tr. 14, 147, 218.

10

played any role in planning or executing the kidnapping of the Victim, but rather served solely as guards.  Defendants were initially told that they would be required to guard the Victim for about 15 days, id. 34, 113, but they ended up guarding the Victim for about ten months.  During that time, defendants made several requests to be relieved.  For example, after the initial 15 days, Rengifo and Dogirama asked Silver to be relieved of guard duty, but their requests were refused.  Id. 34, 134. Rengifo made the same request sometime later, but Silver again declined to relieve him.  Id. 36.  Rengifo testified that the order to guard the Victim was a "special order," Tr. 30, and all defendants understood that the punishment for disobeying the order to guard the Victim could have been execution.  See Tr. 32, 120, 248-50.

The defendants guarded the Victim in a series of remote jungle camps about one or two hours' walking distance from each other.  See Tr. 250-51; see also Government's Memorandum of Law in Response to the Defendants' Motion to Put on a Duress Defense at Trial ("Gov Mem.") at 6.  Silver maintained a base camp within an hour of each of these camps, and Ortiz testified that, at the final location, there were two other FARC camps in the vicinity. Tr. 40, 253, 282.  Ortiz had the most seniority of the guards and had been promoted to the rank of deputy squad leader; he was

11

therefore responsible for setting the shifts for watching the
Victim, and he was able to transmit (but not give) orders.  Id.
p. 257, 270-71.  According to defendants, there were no roads or
villages nearby and no phones, radios, or other means of
communication.  See, e.g., Id. 47-48, 123, 264.  However,
Silver's base camp was on the water, and multiple boats were
available at that location.  Id. 275.

All the guards were armed, and they were all responsible for
keeping an eye on each other and ensuring that the commander's
orders were followed.[10]  The guards were not always together,
however.  For example, Rengifo testified that only one guard at a
time was assigned to each night shift.  Id. 66.  Similarly, the
guards would go in smaller groups to the base camp to provide
status updates to Silver.  Id. 284.  On some occasions, for
instance, Ortiz, Rengifo, and Dogirama would remain together
guarding the Victim while the other three guards returned to base
camp.  Id.  There were also instances where the other guards were
distracted.  For example, a party was held during the 2008-2009

---

[10] See, e.g., Testimony of Rengifo, Tr. 45 ("Well, then I would
have been tied up and there would have been a war council on me
because the other guy left because we all had to be responsible
for one another and for the man."); Id. 64; Testimony of Ortiz,
Tr. 105 ("Q: If you was to do something or break one of the
rules, would the regular rebel soldier guerrilla have to tell you
on you, tell the commanders?"  A: "Yes, of course."); Testimony
of Ortiz, Tr. 122 ("[E]ach one has to watch the others, even when
you go urinate.  If I have to urinate, I have to ask for
permission from one of my companions.").

holiday season when a large number of the FARC guerillas,
including Silver, were intoxicated.  Id. 47, 287-88.

There is some conflicting testimony concerning defendants'
eventual escape from the FARC in February 2009.  Rengifo
testified that he asked Silver to be relieved from guard duty a
third time, and that Silver finally agreed to allow him to return
to base camp.  Id. 52, 258.[11]  However, Rengifo believed that his
request constituted disobedience, and that Silver was planning to
convene a war counsel against him for his refusal to guard the
Victim.  See Id. 69 (Q: "And it was your understanding that the
reason that you were going to be tried and killed was your
refusal to guard Padron?" A: "Of course, because I was disobeying
his order.").  According to Rengifo, a similar war council was
planned for Ortiz because Ortiz had also refused to guard the
victim.  Id. 75-76.  Ortiz testified that a war council was
indeed planned for Rengifo, but indicated that the reason for the
council was Rengifo's disobedience of an order not to communicate
with the Victim.  Id. 257.[12]  Both Rengifo and Ortiz also

---

[11] See Tr. 52-53 ("Well, the last time I asked to be relieved,
Silver took me away from the place where the men were being
watched.  And when I got back to the camp, he said that we needed
to fix a problem.  And so I got frightened and I felt very
desperate and that's when both of us, Gavilan and I decided that
we would flee.  And I told him that I was afraid because it was
possible that they would reach us and kill us.").

[12] "His problem was that we had been given a direct order not to

acknowledged that they had stolen money from Silver to send to their families, but they denied that the theft was the reason for the planned war council.  Id. 76-77, 91, 290-92.  Dogirama simply testified that "Alejandro [Rengifo] was at risk."  Id. 124.

In any event, defendants seem to agree that a war council was being planned to discipline Rengifo, and that this war council might result in Rengifo's execution.  When Rengifo and Ortiz learned of the impending council, they formed a plan to escape.  See, e.g., Id. 258-60.  The night of the escape, Rengifo was on guard duty at Silver's camp, Rengifo's cousin happened to be the second guerilla assigned to guard duty, and Ortiz scheduled his own watch to coincide with that of Rengifo and his cousin.  Id. 81-82, 260-64.  Ortiz asked Dogirama, whose watch directly followed Ortiz's, if he would like to escape with Rengifo, and Dogirama agreed.  Id. 139, 262-64.  With help from Rengifo's cousin, the three defendants stole a boat and left the camp along with two women.  Id. 54-55, 81-84, 262-64, 294.  After traveling for about three hours, the defendants surrendered to the Panamanian police on the morning of February 10, 2009.  Id. 264; see also Gov. Mem. at 7.  Defendants told the police that

---

speak with him and keep him tied up.  And I got together with the
commander and we came to an agreement that he didn't need to be
tied up because he was rather elderly.  So his problem was, due
to the fact that we hadn't had him tied up and the man was also
allowed to play dominoes and cards and other things and speak to
the man, and that wasn't supposed to be done."

they were escaped members of the FARC.  Tr. 86.  On February 11,
2009, the Panamanian police turned defendants over to Colombian
authorities, who enrolled defendants in a demobilization program
designed to reintegrate former FARC members into society.  See
Gov. Mem. at 7.  On March 13, 2009, the Victim – who had been
released in exchange for ransom approximately three weeks earlier
- identified photos of each of the defendants as his captors.
Id.

In addition to the testimony summarized above, defendants
offered evidence from expert witnesses.  Briefly stated, Dr.
Katherine Porterfield, a clinical psychologist, interviewed
Rengifo and arrived at the following general conclusions:

> Mr. Rengifo's reported mental state during his time as a child
> and adolescent soldier with the FARC is consistent with that
> of an individual subject to a brutal, involuntary and
> hierarchical military system, much like those used in armies
> that conscript child soldiers.  He described his belief that
> he would be killed should he disobey or escape from the FARC.
> It is within this context that he served as a guard over a
> kidnapped man.  When he ultimately escaped, he believed he
> would certainly be killed, either by the FARC who would
> capture him or the authorities to whom he turned himself in.
> His descriptions of his behavior at this time of staying in a
> frightening and oppressive environment and following orders is
> consistent with what young people forced into war and battle
> experiences often report.

Report of Dr. Katherine Porterfield, dated March 14, 2011, at 10.
See also Tr. 149-95.  Rengifo also called Dr. Marc Chernick, a
professor at Georgetown University, who offered to provide
background information on the FARC, including its military

organization and disciplinary procedures.  See Report of Dr. Marc
Chernick, dated March 14, 2011, ¶ 10; see also Tr. 195-218.

Dogirama called Dr. Neil Blumberg, a forensic psychiatrist,
who testified, among other things, that Dogirama is currently
suffering from posttraumatic stress disorder and depression
attributable to his experiences with the FARC.  See Report of Dr.
Neil Blumberg, dated April 1, 2011; Tr. 298-317.  Although
Ortiz's proposed expert witness, Dr. Jose M. Arcaya, a
psychologist, was unavailable to testify during the hearing, he
submitted a report to the Court giving conclusions roughly
similar to those of Porterfield and Blumberg, and offered to make
himself available at a later date.

To determine whether the defendants may present the defense
of duress before a jury, the Court must consider whether the
evidence summarized above, construed in the light most favorable
to the defendants, is sufficient to satisfy each element of the
defense of duress.  The first two elements, which are in some
respects interrelated, require the defendant to establish "a
threat of force directed at the time of the defendant's conduct"
and "a threat sufficient to induce a well-founded fear of
impending death or serious bodily injury."  United States v.
Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005) (emphasis added).  It
is well-established that "[e]vidence of a mere 'generalized fear'

16

does not satisfy the requirement of a well-founded fear of impending death or serious bodily harm; rather, there must have been a threat that was specific and prospects of harm that were immediate." <u>United States v. Stevens</u>, 985 F.2d 1175, 1182 (2d Cir. 1993).  <u>See also United States v. Housand</u>, 550 F.2d 818, 825 (2d Cir. 1977) ("the fear must be more than a general apprehension of danger, particularly if one has the chance to escape or to seek the protection of the Government"); <u>United States v. Villegas</u>, 899F.2d at 1346 (upholding district court's decision to preclude evidence on the duress defense where defendant failed to "present evidence of more that a generalized fear").  Similarly, there must be close proximity in time between the threats and the allegedly induced actions.  <u>See United States v. Paul</u>, 110 F.3d at 871 ("The availability of the duress defense in this case turns on the point in time as to which the defendant faced imminent danger and lacked an opportunity to avoid the danger except by committing an unlawful act."); <u>United States v. Podlog</u>, 35 F.3d 699, 704 (2d Cir. 1994) (defendant in conspiracy case was "required to demonstrate that the necessary threatened force was present at the time of his agreement to participate in the conspiracy").[13]

---

[13] <u>See also</u> LaFave § 9.7(c) ("On principle, the threatened harm, though perhaps it need not be 'immediate,' ought not to be remote in time, for until the threatened disaster is pretty close to happening, there may arise a chance both to refuse to do the

Defendants have failed to satisfy these rigorous standards. None of the defendants testified that the order to guard the Victim was accompanied by any specific, immediate threat of force.  Indeed, at no time during the entire ten-month period that defendants guarded the Victim did Silver or any other FARC commander make a specific threat against any of the defendants. At no time were defendants told that refusing to guard the Victim would result in any adverse consequence.  While the defendants testified that they were under standing orders to obey commands from their superiors, this is insufficient to satisfy the first element of the duress defense.  The caselaw is clear that there must be "a threat of force directed at the time of the defendant's conduct," <u>United States v. Gonzalez</u>, 407 F.3d 118, 122 (2d Cir. 2005), and in this case none of the defendants testified that their commanders ever made even a single specific threat during the entire ten months the Victim was held captive. Examples of specific threats that had occurred years or even decades earlier are plainly insufficient to satisfy the well-established legal standards.[14]

---

criminal act and also to avoid the threatened harm – the opportunity to escape without undue danger which the cases recognize as enough to deprive the defendant of his defense.")

[14] <u>See, e.g.</u>, Testimony of Rengifo, Tr. 24 ("<u>[W]hen I was recruited</u> [Silver] said that if I fled the FARC and he caught me, he would kill me.") (emphasis added).

Relatedly, defendants have failed to proffer evidence of a "well-founded fear of impending death or serious bodily harm." United States v. Stevens, 985 F.2d 1175, 1182 (2d Cir. 1993) (emphasis added). Again, defendants guarded the Victim for over ten months in a series of camps outside the presence of the FARC commanders. See, e.g., United States v. Gaviria, 116 F.3d 1498, 1531-1532 (D.C. Cir. 1997) (affirming district court's decision to preclude defendant's duress defense when the conspiracy at issue lasted over thirteen months). While defendants have presented evidence of their generalized fear and "general apprehension of danger," United States v. Housand, 550 F.2d 818, 825 (2d Cir. 1977), this is again insufficient under the case law. See Villegas, 899 F.2d at 1344 (defendant's generalized fear of Colombian cartels did not "satisfy the requirement of a well-founded fear of impending death or serious bodily harm"). Indeed, the only evidence in the entire record of what conceivably could be considered "impending harm" is the testimony that a war council was rumored to be in the works for Rengifo and possibly Ortiz. Even construing the possibility of a war council that may or may not have led to the imposition of a wide-range of punishments as "impending harm," the record is clear that the defendants escaped from the FARC almost immediately after they learned that the council was being planned.

19

Indeed, it is with respect to the third element of the duress defense, the lack of an opportunity to escape, that the Government's argument is the strongest.  It is well-established that "where there is reasonable opportunity to escape the threatened harm, the defendant must take reasonable steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities."  United United States v. Bakhtiarti, 913 F.2d 1053, 1058 (2d Cir. 1990) (citation omitted).  See also United States v. Caban, 173 F.3d 89, 94 (2d Cir. 1999) (defendant was properly barred from asserting a duress defense where "[h]e had several opportunities to end his involvement in the conspiracy and warn the police, but he did not do so").  Whether a defendant had a "reasonable opportunity" to escape is measured by an objective standard, which requires the Court to consider whether a reasonable person in the defendant's situation had "a chance both to refuse to do the criminal act and also to avoid the threatened harm."  United States v. Posada-Rios, 158 F.3d 832, 873 (5th Cir. 1998).  See also United States v. Meraz-Valeta, 26 F.3d 992, 995 (10th Cir. 1994) ("In proving that there were no legal alternatives available to assist him, a defendant must show he was 'confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal

20

acts.'") (emphasis removed and citation omitted)).  The law does not excuse failures to act based on subjective factors such as a defendant's unusually heightened sensitivity to risk or distrust of the authorities.  See United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005) ("Gonzalez's subjective belief that going to the police would have been futile is insufficient to demonstrate that she had no reasonable alternative but to violate the law.") (2d Cir. 2005); United States v. Jankowski, 194 F.3d 878, 881, 883 (8th Cir. 1999) (defendant's distrust of police, which arose from father's imprisonment in Poland, did not satisfy the requirement that defendant make prima facie showing "that he had no reasonable, legal alternative to violating the law").[15]

The cases also make clear that even a small window of opportunity to escape is sufficient to preclude the duress defense as a matter of law.  The Second Circuit's decision in United States v. Alicea, 837 F.2d 103 (2d Cir. 1988) is particularly instructive.  In that case, two female defendants, Alicea and Cabezas, claimed that they were abducted by two men in Ecuador.  Id. at 104.  According to the defendants, the men raped one of the women and forced both of them to carry drugs on their

---

[15] See also United States v. Posada-Rios, 158 F. 3d 832, 873 (5th Cir. 1998) ("A defendant's subjective belief as to available legal alternatives is not determinative. As long as defendant's crisis permitted a selection from among several solutions . . . the necessity defense must fail.")(citation and internal quotation marks omitted).

persons.  Id.  The men then brought the women to the airport and
warned them that someone would be watching them aboard the flight
to New York.  Id. at 105.  The men also threatened to harm one of
the defendant's daughters in New Jersey "if their demands were
not met."  Id. at 106.  The district court precluded the
defendants from presenting the duress defense before a jury, and
the Second Circuit affirmed.  In affirming the district court's
decision, the Second Circuit highlighted the following aspects of
the opinion below:

> The court's opinion emphasized that Alicea and Cabezas were
> free from their abductors for at least twenty minutes prior to
> boarding the plane in Ecuador. During the nine-hour flight,
> each of the appellants had an opportunity to separate herself
> from her companion and the alleged "watcher," and to complain
> to the cabin attendants or the officers on the airplane. The
> stopover at the Miami airport presented an even greater
> opportunity to elude the "watcher" and alert the authorities.
> Finally, the court pointed out, Cabezas had a full and free
> opportunity to seek the assistance of the Immigration officers
> during her private interview, and both appellants had the
> opportunity to seek assistance from the Customs inspectors on
> their arrival in New York.

Id. at 105-106.  Given these facts, the Second Circuit held that
"[t]he appellants here clearly took no steps, reasonable or
otherwise, to extricate themselves from the danger of the
'watcher.'"  Id. at 106.

Measured by these standards, defendants' own testimony
establishes that escape was a realistic option.  Rengifo conceded
that many more people successfully escaped from the FARC than

22

were caught.  See Tr. 77-78.  This concession indicates that the defendants' chances of escaping were in fact fairly good. Similarly, Dogirama testified that he saw many people flee successfully while he was in the FARC.  Id. 146.  Indeed, Ortiz himself successfully escaped in 1997 and suffered no adverse consequence for having made the attempt.  Id. 237, 265-66. Although defendants suggested that a unique confluence of events enabled their escape (e.g., the fact that Rengifo's cousin happened to be the other guerrilla assigned to guard duty that particular night), there is no reason why the defendants could not have figured out reasonable, legal alternatives to committing the charged crime if they put their minds to it.  Defendants have conceded that they were armed, that they were stationed outside the presence of the FARC commanders, that they were assigned to night shifts alone, that groups of the guards returned to Silver's camp while leaving the others behind, that multiple boats were docked at Silver's camp, etc.  Moreover, the simple fact is that the defendants could have walked off at any time. That they were in the jungle was an impediment, not a prohibition.  The defendants must show that they had "no reasonable alternative but to violate the law," United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005), not merely that the alternative entailed some degree of risk.  Indeed, the fact that

defendants successfully escaped on their very first attempt demonstrates that escape was a reasonable alternative.

Accordingly, the defendant's own testimony is insufficient to establish that the defendants acted pursuant to a threat of force directed at the time of the hostage-taking, that the threat was sufficient to induce a well-founded fear of impending death or serious bodily injury, or that defendants lacked a reasonable opportunity to escape harm other than by engaging in the illegal activity. United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005). The proposed expert testimony proffered by the defendants does not change this outcome. As an initial matter, the testimony of Dr. Marc Chernick as to the typical practices of the FARC is irrelevant to the Court's consideration of the instant motion. The experience of FARC members in general is not relevant unless the defendants themselves endured those same experiences, and the defendants' own testimony is the best evidence of what they have personally endured.

As to the evidence proffered by the two psychologists and one psychiatrist, the Second Circuit has held that such testimony may be admissible "at trial and sentencing" for certain purposes, most particularly to bolster the credibility of the defendants:

> We do not agree with Judge Metzner's denial of Smith's request for a psychiatrist on the ground that testimony as to Smith's unusual susceptibility to coercion was irrelevant and inadmissible. A psychiatrist might have testified to other issues at trial and sentencing, including that Smith's

> behavior was not inconsistent with his being under duress. An
> expert might have explained that Smith's extreme fear caused
> him to act aggressively and angrily in the bank and to resist
> arrest. Fear may also have prevented him from using the
> loaded gun against Hammerstone. Explaining this behavior
> might have bolstered the credibility of his duress claim,
> which was relevant to the jury's determination. See Johnson,
> 956 F.2d at 899 (admissibility of expert testimony on the
> psychology of human behavior which "buttressed [defendant's]
> contention of duress"); United States v. Hearst, 563 F.2d
> 1331, 1351 (9th Cir. 1977) (psychiatrist may testify as to
> the voluntariness of defendant's action in a case involving
> duress), cert. denied, 435 U.S. 1000, 56 L. Ed. 2d 90, 98 S.
> Ct. 1656 (1978).

United States v. Smith, 987 F.2d 888, 891 (2d Cir. 1993).

However, the defendants' credibility is not an issue for the

purposes of this motion because the Court for the purposes of

this motion has accepted all of the defendants' testimony as true

and construed all reasonable inferences in favor of the

defendants.  Moreover, although the Second Circuit has held that

psychological testimony is not "irrelevant" for certain purposes,

the Court finds that such evidence is at best of limited value in

assessing the objective legal standards at issue.

      This does not mean, of course, that such testimony may not

be helpful at sentencing. 18 U.S.C. § 3553(a) specifies that

"[t]he court, in determining the particular sentence to be

imposed, shall consider . . . the nature and circumstances of the

offense and the history and characteristics of the defendant."

Thus, for the purposes of determining defendants' punishment, the

Court may quite properly consider expert testimony regarding

defendants' extremely difficult upbringing, their forcible abduction as children into the FARC, the psychological and physical pressures they endured, their subjective mental state, and the role that any mental or psychological trauma may have played in influencing their behavior.  Defendants routinely offer evidence of such extenuating circumstances to mitigate their punishments, and it will be so considered here.  But none of this is relevant to guilt or innocence, as opposed to punishment.

For the foregoing reasons, the Court concludes that the defendants' evidence is insufficient as a matter of law to establish the defense of duress, and that "no proper interest of the defendant[s] would be served by permitting [their] legally insufficient evidence to be aired at trial." United States v. Villegas, 899 F.2d 1324, 1343 (2d Cir. 1990).  The Court therefore affirms its May 23, 2011 Order denying defendants' motions to present the defense of duress at trial.

JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         September 9, 2011

26